Cox v. Duke Energy. Mr. Hodge, whenever you're ready, we'll hear from you. Good morning. I'm John Hodge from Columbia, South Carolina. On behalf of the appellant, I'm here with my co-counsel, Jeffrey Chambers. May it please the court, in a synopsis, the district court granted summary judgment and applied an incorrect standard in this case. Virtually all the inferences and material questions of fact were decided in favor of the moving parties, the sheriff's defendants and the Duke defendants. The errors extended to the validity of the release, whether Duke was a state actor, whether state tort law was preempted. First, in reviewing the release, the court used the rumory factors sort of as a popular vote and cast inferences against Mr. Fleming. In essence, had they applied a proper standard, the court would have found that the release was obtained under duress and against Mr. Fleming's will. Any one root rumory factor can invalidate the release, but the district court appeared to have a tally of yays and nays as if to keep score with respect to the release. Are you sure that's where you want to start? I mean, it's up to you, of course, but you want to start with the release? I'm sorry, Your Honor, I can't hear. You want to start by discussing the release. We're talking about whether the release is valid. About the rumory factors and the validity of the release, correct. In rumory, he had three days to consider the release before signing it. Mr. Fleming had 20 minutes prior to the trial sitting on a bench outside the courtroom. The Sixth Circuit has held that 30 minutes is entirely insufficient. And being presented with the release the day of the hearing at the courthouse is also insufficient. I want you to consider the environment he was in during those 20 minutes. He was intimidated into drafting the release without the assistance of counsel in the drafting. He strongly argued with his lawyer during this process. And he, in Mr. Fleming's own words, the lawyer was agitated. His lawyer, he told his lawyer that the FAA found that he had not violated their rules. He understood that the FAA had an exclusive jurisdiction over aircraft, but he was given false information by his lawyer. The lawyer was belligerent, told him that there were F-16s that had been scrambled from a nearby Air Force base, which was not true. He was berated by his attorney for a big mess of things. He didn't also testify. What do we do with the fact that when asked, did your attorney explain to you you have the right to proceed to trial on a breach of peace charge if you choose? And he said yes. So we're going to go behind his own statement that he got it, that he had enough time, that he was okay with making the decision at that time. Rumery presumes that one makes a knowledgeable and reasoned decision. In the amount of time he had in the courtroom. No, I'm sorry. He knew he was giving up the right to go to trial on a breach of peace charge, that he could do so if he wanted. And that if he signed the release, he wouldn't. Factually, what is it, your contention, that he didn't understand? He's presented with the option of the release right before a trial. He really doesn't have the time to comprehend and make a reasoned decision. But he said he did. It wasn't a question of whether he had counsel or not, it was how good a counsel he had, how good advice did he have. But we have to assume, that's not something we, what we have is, we're not looking at ineffective assistance of counsel in this context. He was asked, what more are we to address if he says he understands the right he's giving up and what he gets for it? I think I'm answering your question. I think what needs to be addressed is the fact that he had a lawyer who failed to object to an arrest warrant that was defective on its face. There was no jurisdiction to make the arrest. There was a warrantless search of the man's glider. Mr. Fleming said, I was in a kind of a position where I didn't have much option than to sign it. And so, in essence, it was beyond the fact that he had bad advice. It was beyond the fact that he was browbeat and pressured. It's undisputed, there was also prosecutorial misconduct because the sheriff pressed charges when they knew they had a defective warrant, when they knew that they had no jurisdiction to arrest him for flying an aircraft. And the apparent criminal justice prosecutorial objective of the release was to cover up an arrest where there was no jurisdiction. And the release was not judicially approved, Your Honor, as well. And so that certainly cast doubt on it, even though he was outside the courtroom. The nature of the charges and the evidence against the accused didn't matter to a 70-year-old man who was a law-abiding, naturalized citizen. And so, consequently, if you look at the totality of the circumstances, where he was in those 20 minutes, he didn't have time to make a reasoned decision. Now let's talk, as well, about preemption. State tort law was not preempted here. The district court did not conduct a meaningful analysis of the law and this state of the law. When taken to a logical extreme, what the district court would have done would grant Duke basically virtual immunity, no matter how reckless conduct might be. Mr. Fleming's constitutional rights also can't be preempted. Now here's the problem with the district court's opinion. They say that there would be some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels. But the court made this statement without any foundation, evidence, or analysis in the record. It cited nothing from the record to support that opinion. In fact, contemporaneous with Mr. Fleming's landing, there was a Duke email that says there were no aspects of this event related to radiological health and safety of the public or on-site personnel. Also, Supreme Court precedent does not support preemption. The English case that was cited by the district court, cited by both parties in briefs, found no preemption. English does say, English was a whistleblower claim of a woman, Vera English, who was filing a case, a suit, about radiological cleanup at a facility where there actually was contamination. And the Supreme Court said that we believe that the whistleblower case, that this effect is neither direct nor substantial to place it in the preemptive field. Another case that was cited, actually was not cited by the district court, but was cited by the appellant, Gideon Atomic versus Miller, also found no preemption. There, the court cited the Silkwood case. We believe that Congress may reasonably determine that incidental regulatory pressure is accessible, whereas direct pressure is not. The preemption comes from the Pacific gas and electric case, Supreme Court case. Please speak up, Your Honor. I said the preemption, field preemption holding comes from Pacific gas and electric. And the Supreme Court said the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states. Now, the question, it seemed to me, on whether this is preempted, has to address that question. Was this an issue of nuclear safety concern? And this was a nuclear plant. And there are directives that any suspicious activity, any suspicious planes, fall within that field. And under the NRC regulations, any suspicious planes have to be reported to the FBI, the FAA, and local authorities. And that's exactly what they did. They thought this plane was suspicious. Further, they have expressed concern about suspicions when you have a plane not just flying over, but circling and loitering are the words. And that's exactly what this glider was doing. Now, who's to say that this craft was not taking pictures, photographing, scanning, scouting out this plant for an untoward event, or even directly armed for an untoward event? The people on the ground don't know that. They're following the regulations for the nuclear safety of the plant, and they report it. Now, why doesn't that fall directly under Pacific Gas and Electric? Your Honor, the simple answer to your question is that the FAA regulates aircraft. I'm not talking about the FAA. I'm talking about the Nuclear Atomic Energy Act of 1954, which became something else. Well, Duke had certain procedures and certain regulatory responsibilities, and certainly Mr. Fleming is not trying to regulate Duke. His estate is not trying to regulate Duke. This arises out of the aircraft flying almost directly over the plant once and then circling continuously right next to the plant, creating a suspicion. And that action taken in response to that suspicion is within the field, of Pacific Gas and Electric. That's what the preemption is about. Duke is required to have certain procedures. They exceeded their procedures in this case, and certainly any time somebody sees Mr. Hodges, that's not the preemption question. The preemption question is that the Nuclear Regulatory Commission requires Duke to report suspicious activity within the purview of the nuclear plant. So why doesn't this fall within the scope of field preemption? Well, first off, Duke determined that this was not a reportable incident to the NRC and their reports, and that's confirmed in Duke's e-mails. What we're talking about is the field of regulating the safety and the security of nuclear power facilities. You understand field preemption, don't you, which is you articulate the scope of a field, and then there cannot be a state cause of action within that field of any kind.  No, no, I'm asking you, let's stay with the scope of the field first. Is this involved, is the conduct in this case involved concerns, safety aspects of construction and operation of a nuclear plant? Frankly, the record shows that there was no threat to the power plant at all. Now, they have a legal responsibility, but I agree, Your Honor, they have a legal responsibility to assess, and that assessment meant they called the FAA, and the FAA said it's a non-event, we're not interested in this, and that's where it should have stopped. But what they did is hold it. You're not addressing the preemption issue. We're not talking about if they went beyond the field, I mean not beyond the field, if they did something wrong within this area, it's still subject to federal preemption. Well, I believe that they went far beyond what their responsibilities were, and that's really where it goes outside the preempted field. If they were trying to basically work and try to change Duke's, the way that Duke viewed this, that might be akin to regulation. But here, you know, basically Duke went far beyond what was required. They went out to the airport. They ordered helicopters. They ordered a sheriff's helicopter, and there's a document in the record that shows. Don't we wish we had ordered helicopters and F-16s at 9-11? I mean, that was, those planes were not that suspicious. Those planes were passenger planes. Well, in 9-11, we heightened our security, and nuclear plants is one of the places that we're enormously concerned. This was a suspicious aircraft circling, I don't know how many times, six to 12 times around. But, Your Honor, it's up to the Department of Defense to call air support, not for Duke to call its own private air support through the sheriff's department. Where do you get that? This is a federal preemption. Basically, and I want to get on just for the time that we've got to talk about the fact that there was joint action. Duke acted under the color of law because there was joint action under the law. Basically, to capture and detain Mr. Fleming, there's documents that Duke was assisting in that capture and detaining. Duke ordered an out-of-jurisdiction helicopter. The record is clear that they asked the sheriff. Sheriff Byrd did that. Then Duke used the sheriff's department's frequencies as well. They had actually security people that had sheriff's frequencies. They entered the scene of the arrest. They were given access that private citizens don't get. And Duke was present at the airport with the sheriff's deputies before the aircraft landed. Well, they're not a private citizen. They're a regulated. After there had been an alert at the plant that also had been canceled, and they were there waiting. So Duke has claimed that they also got consent to speak to Mr. Fleming, and he was handcuffed. Well, if he was a private – if Duke was a private entity, they would not need consent to talk to somebody who was detained. And, of course, Duke also told the airport manager that they were interested in shooting down this glider. So that goes – Let me ask you this. If it turned out – if it turned out – this is hypothetical. Yeah. It turned out that the occupant of that plane, the operator of that plane, was a high-level foreign terrorist, and that was demonstrable. Would all this conduct have been justified? Well, Your Honor, Duke had been on notice – I said if it's hypothetically, if this was a terrorist that they identified after they brought him to the ground, would all this conduct have been justified? Well, Your Honor, let me say that Duke had been on notice of glider operations for a number of years. I'm asking you a hypothetical question. Can you handle the hypothetical? The hypothetical is if this turned out to be a foreign terrorist scouting the plant and taking photographs of the plant, would this conduct have been justified that you described? I think it would have still been unreasonable because that's a job for the Department of Defense and the FAA and not for the Dawson County Sheriff's Office or Duke Energy. And so when the NRC says to call local authorities in response to a suspicious plane, you think the NRC is out of its own field? Is this a federal regulation? I do, but I believe that Duke went way outside of its procedures and its response. And I believe we're also out of time. Thank you. You have 35 seconds. Oh, no, you are out of time. All right, we'll see you back on rebuttal. All right, Mr. Gottschall. Yes, thank you, Your Honor. May it please the Court, I'm Tom Gottschall with Hainsworth-Sinclair Board in Columbia, South Carolina. And I'm here representing the Duke defendants, namely Duke Energy Progress and the H.P. Robinson Nuclear Power Plant in Hartsville, South Carolina, which it operates, and also Randy Gideon, who is the plant manager. With me is my colleague, Ross Shealy. And seated also at the table is Buddy Arthur from the Aiken Bridges firm in Florence, and he represents the sheriff defendants. I'm going to make argument with respect to the Duke defendants. And I just want to summarize really what's at stake here, where we are. The question really is whether the plaintiff appellant can impose a state court liability on Duke, which is a federal licensee here. Although the actions that Duke took really were in furtherance of its obligations under federal regulation for the ensuring of the nuclear plant's safety and security. That's what the matter is. And I think a review of what Duke did and what Duke didn't do, and then the federal preemption issue and the established law there and the established law in the area of the 1983 claim will reveal that Judge Hendricks, in fact, was correct. So let me just talk for a moment about what did Duke do. Duke, as you were making reference to, Judge Meyer, Judge Niemeyer, saw something in the sky. It didn't understand what it was. It saw an object over the plant, and then the object circled in proximity to the plant several times. You can see it on the flight recorder. And so they didn't know what it was, but it looked suspicious to them. So under federal regulation, they took action, and they did call local law enforcement. They called the airport, and they called the FAA, and they called Shaw Air Force Base, a nearby Air Force Base. The latter two couldn't see this object on the radar, so it remained suspicious. They went, some of the team, some of the Duke security team went to the airport because Duke was now on heightened awareness, the Duke plant. And they were going to have the report to the Nuclear Regulatory Commission if, in fact, there was something that was really suspicious. So they went there to see what the deal was. And, of course, they saw Mr. Fleming, and they also spoke with him for a moment after getting permission. They also had the opportunity just to look inside the fuselage. This is a small plane, a small glider. They didn't have to get in. They just looked in it to see if there was anything suspicious, cameras or that sort of thing. I think one of the problems that I want to address with respect to one of the facts are a suggestion. We dispute a lot of the facts which the Plaintiff Appellant's counsel recites, as did Judge Bruce Hendricks in footnote five of the opinion. She went in good faith to look at that opinion and the facts that were charged by the Plaintiff Appellant and couldn't find them. The Appellant's brief today, as before you, includes a misstatement of fact as well. Among the things that is said in that brief is that the supplemental incident report, which was prepared on July 27th, this incident took place on July 26th, that the supplemental incident report was written by a Sergeant Chris Pittman, who also happened to be, they said, an employee of the Duke security team. That's just completely false. It's not the case. There's a deposition of Sheriff Byrd, and he was asked two years later whether anybody on the Duke security team also had some sort of reserve status with the Sheriff's Department. He mentioned, he said, at present, a few people, and then he mentioned Chris Pittman. But at present was in 2014. There's no evidence he was in 2012. So the inferences that Plaintiff Appellant wants to be drawn are oftentimes based on facts which really are not demonstrably in the record. What did the Sheriff's Office do? Well, the Sheriff's Office took the report, and then they were the ones who... What else did Duke do? Well, that's really what... Duke just called the various agencies and institutions, and that was it? No, Duke did, Your Honor, go to the airport. Well, I understand that. Yeah, but that was basically it. And in the deposition of Captain Street of the Sheriff's Department, I went through with him what the Sheriff's Office did, all sorts of the prosecution decisions, the detention, apprehending him, the arrest warrant, all that. And I asked, I said, did Duke have any role in any of those decisions? And he said no. And Captain Joyce Everett, also on the Sheriff's role, was asked whether she arrested Mr. Fleming for Duke. And she was astonished at the question and said, that's not the way this works. We arrest, we make these decisions. So that's what the Sheriff did. And what Duke, of course, did was, again, following federal regulations. And I won't go into it specifically, but, of course, I make allusion to some of the materials under SEAL, including a directive on December 8, 2006, to the nuclear power plants in America and nuclear storage places. And I think what Duke did is exactly consistent with what that advisory describes. And then, of course, Duke is heavily regulated under the 10 Code of Federal Regulations, 73.55, including even training. So there's extensive regulation here. So when you get to preemption, obviously Pacific Gas and Electric found this field of nuclear safety to be preempted. And then we get to the English case in 1990, which sets up this test of whether there is some direct and substantial effect upon the decisions of those who are decision makers. In other words, in that case, the plaintiff, a woman who worked at a nuclear facility, had a complaint about the way things were being handled. She said then that she was a subject of retaliation. She filed a lawsuit for the intentional infliction of emotional distress. And that was based on facts. This was a 12 v. 6 situation. She said that she'd been given a different job, make work. She'd been ridiculed as being paranoid. They were trying to trump up false charges against her. So that was the claim that she wanted to make. And the question was whether that was preempted. And the court said really in a sense it goes back to Pacific Gas and Electric again, but whether the tort claim is so related to radiological safety so as to be preempted. So with respect to intentional inflection of emotional distress, the court really inquired in the end whether this was tangential to those who make decisions with respect to nuclear safety and gave some examples like minimum wage, child labor law. That sort of stuff is tangential. Or did it have some direct and substantial effect? You don't have to knock all the ten pens down, but is there some direct and substantial effect? And in that case, they didn't find it. Our case is so much different because it strikes at the heart of plant safety. And you can read in the newspapers in these uncertain times, there was a situation where in France a glider landed at a nuclear power plant and set off a smoke bomb. Now they were anti-nuclear people, but the point is if you're in the ground and you don't know what's happening, you see something up there, you have this obligation to report it. With respect to the 1983 claim, I would say, first of all, of course, Duke is a private entity. Duke did not. You can't attribute to Duke conduct attributable to the state. And, in fact, I think it's really difficult to get state action when, in fact, Duke is following federal regulations and doing what it's supposed to be under those sorts of circumstances. So I think, really, the state claim falls, and what Duke did is what it should have done. I would just come to a conclusion and say that what's at stake here is whether nuclear power plants, the places where nuclear waste is proposed and all sorts of things, whether these are to be subject to state tort claims if, indeed, they're reporting suspicious activity. It strikes at the heart of what this is all about, and the cases that found exemptions from federal preemption nowhere are close to this. If this isn't preempted, it seems to me nothing is preempted. I have nothing further to add unless you have some questions. Thank you, Mr. Joshua. Mr. Arthur? Thank you, Your Honor. May it please the Court. I'm Samuel Arthur from Florence, South Carolina. I represent the Darlington County Law Enforcement Appellees in this case. It's our position that the district court correctly granted summary judgment to my clients in this case and astutely noted that in its order that this case would appear to be exactly the type of minor criminal matter where a release-dismissal agreement represents a sensible resolution. It's our position in this case that the law is very clear in this circuit and throughout the nation with respect to release-dismissal agreements such as the one that was executed in this case. The only issue for my clients is whether or not the release-dismissal agreement in this case should be enforced against Mr. Fleming. Your clients didn't do anything to develop a waiver, did they? No, Your Honor. In fact, I was about to... They didn't participate, did they? Your Honor, their only participation was agreeing to dismiss the criminal charges in receipt of the release-dismissal agreement executed by Mr. Fleming. And the courts have... In fact, I believe this court has already found that that's certainly sufficient consideration for such an agreement. The lower court in this case seemed to heavily rely upon the fact that the release-dismissal agreement in this case was not simply presented to Mr. Fleming, but rather drafted by Mr. Fleming in his own handwriting. And so I would like to speak briefly to a couple of points that were raised by Counsel for Appellant with regard to the 20 minutes that he had and whether or not there is some magic time frame that a negotiating party in a status such as Mr. Fleming has to have a certain amount of time to consider the ramifications of his actions that's simply not supported by the case law. In this case, Mr. Fleming had been released from custody for several months. It's true that he had apparently had some disagreement with his counsel, but the important factor is that he had counsel in this case. Case law does not suggest that the test includes an evaluation of the sufficiency of the counsel, but only consideration of whether or not the party actually had counsel. In this case, it's clear by Mr. Fleming's own testimony that he was a well-educated individual, that he was sufficiently competent to understand the ramifications of his actions, and that he received the benefit of the bargain that he negotiated, that being the dismissal of the criminal charges that were against him. With regard to the argument that was made that failing to satisfy any one of the remory factors renders that consideration or renders the agreement null and void simply not supported by the case law, this court in the Rodriguez case followed the remory factors and evaluated the circumstances of that case by weighing the evidence in the record and whether or not it satisfied the five elements. In this case, there may be some suggestion or there has been an argument that the dismissal agreement has to be judicially approved, and that's simply not the case. The Supreme Court, in fact, in the remory case, stated that release-dismissal agreements are often reached between prosecutor and defendant with little or no judicial oversight. So while it might be a great thing if the court is involved in approving the release-dismissal agreement, it's certainly not a requirement, and the absence of such approval by a court is not sufficient to defeat the release-dismissal agreement in this case. Our position is that the district court's consideration of the remory factors was thoughtful, thorough, and correct, and we ask that it not be disturbed. Thank you. Mr. Hodge. I'd like to go back and talk somewhat about, you know, explain something about the release. In a nutshell, Mr. Fleming did not have the time and 20 minutes and the environment outside the courtroom, being pressured by his lawyer, being pressured with the thought of a trial in 20 minutes, and that was not any well-educated, reasoned individual still would be placed into a very difficult situation trying to make a rational decision in that process. And so I think when we look at the guidance from the Sixth Circuit and the holdings there, it's apparent that 20 minutes just is not, even for an educated man, is not a sufficient amount of time. Now, as we also look at the... Did he handwrite the release himself? Did he handwrite the release himself? I'm sorry? Did he handwrite, your client, handwrite the release? He handwrote the release without the assistance of his lawyer. Well, okay, but he had time to write it down, didn't he, before he got there? He wrote it. It's about three sentences long. He wrote it, and he thought it was a tentative or preliminary document, and he testified he didn't realize that was a final release. And I think you have to put yourself in that context, that environment. Now, let's talk for a bit or two about the preemptive field because there are procedures, and the procedures are if you see an aircraft, you call the FAA. Now, the FAA had not designated a restricted area or any kind of prohibited airspace by that area. Mr. Fleming was flying by. He spent two minutes flying past the plant. Was it anything unusual? The head of a glider school about a few miles away had called Duke and said we've got gliders every day in the area, and this happened. So Duke was on notice of this kind of activity. So it's perplexing as to why they somehow thought this was suspicious. But when they literally go off the reservation and leave their facility and go to the airport, and they know 24 hours before Mr. Fleming what he's going to be charged with. Do they work to go to the airport? Duke's security detail goes to the airport. I know. What's wrong with that? I mean, they go to the airport because they sighted a suspicious aircraft, reported it, and go to the airport to see what it was about. They are in charge of security of their own plant. I mean, this has nothing to do with preemption. Well, they go to the airport with 17 sheriff's squad cars just around this little glider. That's the sheriff's thing. They reported it to law enforcement, and the law enforcement came. But my point is what did Duke do wrong in going to the airport? Their role is to make a phone call, and if they need to investigate it the next day, they can certainly call the sheriff and find out what happened. But when they order up resources such as a helicopter, when they go to a scene of a sterile runway environment, sterile taxiway, view the glider, talk to Mr. Fleming, obtain consent to talk to him, that's fairly significant. That's a role that private citizens don't have, and that exceeds any kind of protected, preempted field. So what do you think the role of a security guard at Duke Energy is supposed to do? I mean, he's interested in protecting the plant from untoward activity, and so he, the security, reports it to law enforcement and goes to the airport to see what he reported to make sure, I mean, to make sure what he reported wasn't a threat and to lay his concerns. And obviously until they look at the computer or the cell phone or whatever he had, they couldn't fully release Mr. Cox. My point is Duke called authorities and went to the airport, and you say that was a terrible conduct? They called the Air Force base. They weren't interested. They called the FAA. They weren't interested. They said, just let us know what you do, and that's all that happened. But Duke then continued. Now, the regulations that they cite as well, the NRC regulations, first off, 10 CFR 7355 doesn't even mention aircrafts. And the other regulation they cite, 10 CFR 5054, just says that they have to have a procedure if they're notified by a third party of an inbound aircraft, such as the FBI or someone calls them and says there's an inbound aircraft. So the regulations that they want to hang on really don't, are generally inapplicable to the facts in this situation, and Duke has not pointed to one regulation that required them to do what they did here. What about the NRC regulations that direct them to call the FBI and all these others if they have suspicious? Well, it's our contention that they act under the joint actors, and they're certainly liable as joint actors and state actors under that as well. Thank you. All right. Thank you. We'll adjourn court for the day and then come down and recounsel. This honorable court stands adjourned until tomorrow morning. Godspeed, United States, and this honorable court.
judges: Paul V. Niemeyer, Allyson K. Duncan, Henry F. Floyd